330 F.2d 527
 UNITED STATES of America, Appellant,
v.
A. R. BENNING et al., Appellees.
UNITED STATES of America, Appellant,
v.
John H. DUNSHEE et al., Appellees.
UNITED STATES of America, Appellant,
v.
V-R RANCH COMPANY, a corporation, Appellee.
UNITED STATES of America, Appellant,
v.
Dorothy D. BATTIN, Appellee.
 No. 18557-18559.
 No. 18630.
 United States Court of Appeals Ninth Circuit.
 February 14, 1964.
 Rehearing Denied May 11, 1964.
 
 COPYRIGHT MATERIAL OMITTED Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis, Elizabeth Dudley and Richard N. Countiss, Attys., Dept. of Justice, Washington, D. C., and Richard J. Dauber, Asst. U. S. Atty., Los Angeles, Cal., for appellant.
 Angell, Adams, Gochnauer, Elder & Holmes, Philip H. Angell, and Mose Silverman, San Francisco, Cal., and Louis Le Baron, Honolulu, Hawaii, for appellees A. R. Benning, and others and John H. Dunshee and others.
 Price, Postel & Parma and Robert M. Jones, Santa Barbara, Cal., Angell, Adams, Gochnauer, Elder & Holmes, and Philip H. Angell and Mose Silverman, San Francisco, Cal., for appellee Dorothy D. Battin.
 Anson, Gleaves & Larson and John B. Anson, Los Angeles, Cal., for appellee V-R Ranch Co.
 Before HAMLEY, HAMLIN and MERRILL, Circuit Judges.
 MERRILL, Circuit Judge.
 
 
 1
 In these four condemnation cases the District court has, over objections of the United States, affirmed the report and findings of the Commission to which the issue of just compensation had been referred pursuant to Rule 71A(h), F.R. Civ.P. In each case the United States has appealed. Since substantially the same problem is presented by each appeal, the cases were consolidated for argument.
 
 
 2
 Three of the cases — Benning, Dunshee (under the name of Morrison), and V-R Ranch — have already been before this court on appeal. United States v. Lewis (9 Cir. 1962), 308 F.2d 453, 459, 462. In that appeal, upon certain of the Government's contentions, the district court was affirmed. Upon others, however, we remanded for partial rehearing. The district court there had proceeded to affirm the Commission without benefit of a transcript of the Commission proceedings. We ruled that certain of the Government's objections "could not receive the consideration required without a transcript in order to ascertain whether the judgment of the Commission * * * is clearly erroneous." Those rehearings have now been held and it is from the rulings of the district court made on the basis of the rehearings that these appeals are taken.
 
 
 3
 The Battin case is before us for the first time. It involves 3.28 acres of land in the same area of Ventura County as the properties in the other cases here consolidated and was taken for the same project: the Ventura River project known as the Casitas Dam and Reservoir Project.
 
 
 4
 As in the cases before us on the former appeal, the United States here objects that the Commission's report and findings in Battin are inadequate. For the reasons set forth in the Benning and Morrison appeals, 308 F.2d 459, 460, we find this contention without merit. The Battin case thus presents the same problem as the other cases: whether the award determination of the Commission was clearly erroneous.
 
 
 5
 Before we can reach the issues presented on the merits, however, we must, as we did in the former appeal, grapple with procedural problems.
 
 
 6
 At the outset we are faced with a dispute as to the function which this court is to perform on appeals of this sort. Appellees assert that our function is to review the manner in which the district court has acted upon the objections filed to the report and findings of the Commission; that our review is of the actions of the district court rather than of those of the Commission. The United States, on the other hand, asserts that our function is to review the Commission's report de novo.
 
 
 7
 Upon this dispute, we agree with the position of appellees.[1]
 
 
 8
 As we view the matter should we take upon ourselves a de novo review of the Commission we would rob the district court of all significant participation in the case. Further, we would undertake for this court the burden of ascertaining, as in the first instance and in the light of the full record, whether the Commission's findings are clearly erroneous in the specified respects.
 
 
 9
 That burden, in our view, must remain with the district court. Our function is the more restricted one of determining, under a proper assignment of errors, whether the district court has committed error or has otherwise failed in its judicial function in the manner in which it has resolved the disputes raised by the objections filed with it.
 
 
 10
 Our preliminary problem arises from the fact that in these cases we cannot adequately perform that function without a remand.
 
 
 11
 In the first place, in several respects the assignment of errors by the United States is not keyed to the objections filed below nor directed to the manner in which the district court has acted upon them. It amounts, in substantial part, to a new and original set of objections to the commission's report and findings, upon which we are asked to act de novo.
 
 
 12
 In the second place, the district court has given us nothing to review. It has filed no opinion. It has simply ordered the objections overruled and the report confirmed and adopted.
 
 
 13
 We are not here determining the sufficiency of the evidence to support a jury's verdict. We are reviewing the manner in which the district court has performed its function "as a reviewing court." United States v. Lewis, supra, 308 F.2d at 456. We recognize that district courts may not (and need not) all act in precisely the same procedural fashion upon the report and findings of a commission. We do not mean to suggest otherwise. Under Rule 71A(h), the Commission's findings and report shall "be dealt with by the court in accordance with the practice prescribed in paragraph (2) of subdivision (e) of Rule 53" dealing with masters.[2] Such procedural variations in practice as are proper in dealing with masters' reports would therefore appear to be appropriate here. However, since the manner in which the district court acts upon the Commission's report is in turn made subject to review by this court, the district court is as much obliged as is the Commission (see our earlier opinion) to express, by opinion, findings and conclusions, or otherwise, the reasons for its action.
 
 
 14
 These deficiencies, precluding us from the exercise of our appellate function as we view it, are ample grounds for our remanding the case to the district court with instructions that an opinion be filed.
 
 
 15
 Yet, in this case we feel that a remand should be avoided if possible. Much time and money have already been expended here. We should be especially reluctant to remand for no purpose other than to effectively hammer home our views as to our proper function and as to what is necessary if we are to perform it. Since this is the first occasion on which we have expressed these views, we are hopeful that such announcement can satisfactorily serve the ends of precedent. We shall, it should be apparent, be less relucant to remand in the future.
 
 
 16
 In this case we shall (with one exception later noted) accept the assignment of errors by the United States as a paraphrase of the objections filed below. Further, the issues thus presented by the United States place no undue burden upon us, and we can rationally presume that the district court, in rejecting the contentions of the United States, did so for reasons which to us seem clearly apparent. Accordingly we turn to the merits.
 
 
 17
 In our opinion upon the earlier appeal we stated in reference to these cases (308 F.2d at 461):
 
 
 18
 "The problem presented by these cases, in essence, is that the present character of the land, as determined by the commission, is not to be found in its present use. The highest and best use is not found from the past history or present use of these lands but from reasonable future probability in the light of the history of the region in general in its transition from agricultural to residential character.
 
 
 19
 "The position of the United States, in brief, is that regional transition is still too remote from these particular lands and their particular location and that these lands are not suitable to partake, as residential land, in such a transitional process."
 
 
 20
 In all of these cases the Commissioners have found the highest and best use of substantial portions of the lands to be for development and use as residential subdivisions and as rural or view or country-estate homesites. The Government's attack is principally leveled at this determination. We know from Commission findings in Battin that the valleys of Santa Ana and Coyote Creeks, in which the condemned parcels are located, were wholly rural with no existing residential subdivisions. The Government insists that under these circumstances the Commissions were compelled to accept the views of the Government witnesses to the effect that the highest and best use was agricultural with some possibility of country estates.
 
 
 21
 But the Commission, in determining market value, was not confined to a consideration of present use. As we suggested in our earlier opinion as it has been quoted here, highest and best use of the land can be based upon reasonable future probability. United States ex rel. Tennessee Valley Authority v. Powelson (1943), 319 U.S. 266, 275-276, 63 S.Ct. 1047, 87 L.Ed. 1390; Olson v. United States (1934), 292 U.S. 246, 255-257, 54 S.Ct. 704, 78 L.Ed. 1236.
 
 
 22
 That this is the basis upon which the Commissions proceeded is implicit in their findings. It was found in each case that many lands in Santa Ana and Coyote Valleys, and in immediately surrounding areas "were in the transition stage from dry farming and more extensive agriculture to development for small rural estates and residential subdivisions." It was found in each case that "properties in Ventura County and in the area of [the lands condemned] were at the time of the take greatly in demand, because, among other things, a large number of people of retired status were seeking country life on either residential subdivisions or country estates or rural ranges * * *." In each case it was found that as of the date of the taking "there were willing buyers in the open market for lands which were reasonably adaptable to all the uses which the evidence of both plaintiff and defendant showed that the lands in the subject property were reasonably adaptable and capable of being used as of said date."
 
 
 23
 The Government attacks all of these findings as being without evidential support.
 
 
 24
 However, landowner witnesses did testify that there would have been an immediate market for subdivisions on V-R Ranch property; that there were buyers in the market that would have been interested in subdividing part of the Benning land immediately, and that it was probable that the same immediate development could have taken place in the category of country estates. A tentative subdivision map for 250 acres of the V-R Ranch property had been filed and approved by the County Planning Commission a year before the take. Residential subdivision development in the direction of the town of Ojai (at a distance of six miles) had spread quite close to the Dunshee, Benning and Battin properties. While one witness respecting the Dunshee and Battin properties was less optimistic as to residential use in the immediate future, he did testify that it was quite likely that these properties at the time would have interested "many, many buyers" of subdivision property (known among subdividers and land developers as "stock-pilers" or "inventory buyers") who would not have plans for immediate development but would invest for future development. The principal Government expert himself testified that "we are getting away from agricultural values and you have to recognize that there is a residential or rural use element coming into play influencing these values."
 
 
 25
 General evidence as to the region supports a determination that residential use in the not distant future was a reasonable probability. The proximity of Los Angeles County and the general population spill-out from the Los Angeles area, with resulting rapid population growth of Ventura County, demonstrate a potential market. The superior scenic and climatic attractions of these valleys and the nearby location of the town of Ojai, a recognized cultural center, render it wholly reasonable to conclude that had these properties been available to those seeking homesites the area would have been a preferred one. The failure of this prospect to materialize was found by the Commissions to be due to the fact that lands in these valleys were, on the whole, closely held in large parcels by owners who had no interest in selling, wishing instead to be able to continue a way of life they had pursued for many years and had found to their liking.
 
 
 26
 Thus we think the Commission did not err in taking into account potential residential use as bearing on market value of these lands.
 
 
 27
 The United States, however, strongly insists that the method by which the Commission derived market value from such use was improper. The Government correctly points out that a potential future use of condemned property should be considered not as the present measure of value but only to the extent that the prospect of demand for such use would have affected the price a willing buyer would have offered for the property just prior to the taking. Olson v. United States, supra, 292 U.S. at 255, 54 S.Ct. at 708-709, 78 L.Ed. 1236; United States v. Meadow Brook Club (2 Cir., 1958), 259 F.2d 41, 45, cert. denied (1958), 358 U.S. 921, 79 S.Ct. 290, 3 L.Ed.2d 239.
 
 
 28
 The Government contends that the Commission disregarded this principle by valuing the lands as though they were immediately to be developed for residential use as of the date of taking. This is demonstrated, says the Government, by certain language in the Commission's report and by what the Government alleges was an unjustifiable acceptance, as a measure of value, of sales of properties in more developed areas which were presented by the landowners' witnesses as comparable. What the Commission should have done, it is urged, was to accept the sales upon which the Government relies, involving property asserted to be so clearly and completely comparable to the condemned lands as to establish a value which itself reflects any prospective uses and thus renders immaterial any independent ascertainment of highest and best use.
 
 
 29
 With respect to the sales relied upon by the Government — involving 28 parcels located from zero to seventeen miles from the condemned lands — the Commission's report did observe that "there were very few sales of real property of sizeable acreage within the area and there were very few sales of real property within the area which this Commission found to be comparable or similar to" the condemned parcels, and that this necessitated consideration of "sales of comparable or similar properties outside of the immediate area of said parcels."
 
 
 30
 This does not, we think, indicate that the Government sales were totally rejected as bearing on market value. Indeed in each case the Commission's report expressly states that evidence of sales introduced by both parties had been considered. Moreover, most of the Government sales were of substantially less acreage than the parcels out of which the condemned properties were taken.[3] This factor (along with inevitable differences in other physical characteristics) lends ample support to the determination of the Commission — that few such properties were comparable to the condemned parcels.
 
 
 31
 In the light of these considerations and of the wide variation in peracre prices among the various Government sales, it seems clear that the Government has not demonstrated as a matter of law an amount of comparable buying and selling sufficient to have established a prevailing market price for these lands. Cf. United States v. New River Collieries Co. (1923), 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014.
 
 
 32
 As to the sales presented as comparable by the landowners' witnesses, it is true that these included properties in the Conejo Valley (some 25 miles closer to Los Angeles than the condemned lands) in which residential development was in greater demand and to some extent already in process. However, we cannot agree with the Government that the Commissions have blindly accepted this testimony and rejected the proof offered by the Government.
 
 
 33
 Upon close scrutiny it appears that the Commission regarded the comparable sales (on both sides) as not so clearly and completely comparable as to constitute independent evidence of value. Instead, it appears to have regarded them simply as lending weight and illustration to the value opinions of the various witnesses.
 
 
 34
 This is borne out by the Commission's determination of value. The Commission took a middle course between the extremes presented by the adversaries. In the case of some of the lands (notably those of the V-R Ranch), this course was closer to the Government's appraisals than to those of the landowners.
 
 
 35
 In short, the Commission has upon all the evidence on both sides reached its conclusion as to the extent to which the prospect that this land would, in the foreseeable future, be put to use as residential property established or bore upon the present value of the land. From the record, this conclusion cannot in any case for any of the reasons asserted by the United States be said to be clearly erroneous.
 
 
 36
 The United States makes specific attack upon the allowance of severance damages in Battin. The Commission found that the 3.28 acres taken was part of a larger tract, and that the take "virtually cut the larger parcel into two parcels." The report further states:
 
 
 37
 "The westerly 14 acres is connected with the easterly remainder land by only a narrow corridor of side hill property only about 160 feet wide at the narrowest point. This severance complicates and makes more costly a comprehensive planning of the development of the remainder lands and the road approaches connecting the various portions of the land.
 
 
 38
 "The cost of road connections is greatly increased because of the taking. Prior to the taking, a road connection could be developed from the valley lands to the hilltop and ridge portions of the property at a relatively easy grade, and at a moderate cost. Prior to the taking, a good access road suitable to develop said westerly 14 acres of said parcel for its highest and best use could have been constructed to serve said westerly portion of the property with little side hill cuts and fills. This road could have followed closely along the top of the ridge, and could go directly through the part taken for the tank site. This road could give adequate and relatively economical access to the potential hilltop sites which could be developed along the ridge or hilltop portions of the property lying westerly of the property taken. After the taking, the location of this possible road location is blocked off by the tank site being taken."
 
 
 39
 The Commission's award was of $5,000 for the property taken and $15,000 severance damage to the remainder. The award was broken down as follows:
 
 
 40
 (a) Fair market value of whole parcel of which Parcel
 One (Unit SM-15) is a part $113,000.00
 (b) Fair market value of remainder after the taking of
 Parcel One (Unit SM-15) 93,000.00
 (c) Just Compensation Damage or Award 20,000.00
 (d) Fair Market Value of Parcel One (Unit SM-15) 5,000.00
 (e) Severance Damage 16,000.00
 (f) Special Benefits 1,000.00
 
 
 41
 The United States attacks the allowance of severance damages under these circumstances as purely speculative. It states:
 
 
 42
 "The United States has been required to pay for the loss of a road that never existed that was to service subdivisions that were not built."
 
 
 43
 Accepting that a determination of market value and of highest and best use can properly be based upon reasonable future probability, we find no error in the allowance of severance damages here. The Commission appears to have been fully conscious of the fact that its problem was to determine how this severance would affect the present market value of the remainder. It states:
 
 
 44
 "The undersigned Commissioners having been instructed by Order of this Court that by `just compensation' is meant the actual fair market value of said above enumerated parcel as of the date of the taking of such parcel which is the date upon which the Declaration of Taking was filed, to wit, August 22, 1958 * * *."
 
 
 45
 It does not appear that the Commission has arbitrarily added the increased cost of road building as though the character of the remaining property, in its highest and best use, was a presently established fact. Rather it appears, as in the case of the taken property, to have tempered its judgment to comport with the probabilities in order that present market value might be found. The allowance was a substantial reduction from that sought by appellees.[4] We cannot find the award to be clearly erroneous.
 
 
 46
 Finally, the United States asserts that in certain respects "there is every reason to believe that there are duplication and contradiction of values in substantial amounts." This subject is entirely foreign to the objections to the Commission's report as filed below. For this reason, it is not properly before us.
 
 
 47
 In all cases, judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The Fifth Circuit has explicitly taken this view as to the function of a court of appeals in such cases. United States v. Twin City Power Co. of Georgia (5 Cir. 1958), 253 F.2d 197, 201-203; Parks v. United States (5 Cir. 1961), 293 F. 2d 482, 483; United States v. Tampa Bay Garden Apartments, Inc. (5 Cir. 1961), 294 F.2d 598; United States v. 2,872.88 Acres of Land etc. (5 Cir. 1962), 310 F.2d 775, 779, cert. granted (1963) 372 U.S. 975, 83 S.Ct. 1109, 10 L.Ed.2d 141
 
 
 [2]
 Rule 53(e) (2) provides that: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. Within 10 days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion and upon notice as prescribed in Rule 6(d). The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."
 
 
 [3]
 The parcels out of which the condemned property was taken were 1,022.20 acres (Benning), 1,594.52 acres (V-R Ranch), 469.78 acres (Dunshee) and 68.51 acres (Battin). Seventeen of the 28 sales relied on by the Government were of less acreage than the Battin land, and of these only four exceeded 50 acres. Of the other eleven sales, only four involved parcels exceeding 200 acres
 
 
 [4]
 Appellees' witnesses valued the severance damages at from $21,950 to $22,810