### ASSATEAGUE ISLAND CONDEMNATION CASES OPINION NO. 3.

#### UNITED STATES of America

v.

**222.0 ACRES OF LAND MORE OR LESS, IN the COUNTY OF WORCESTER, STATE OF MARYLAND, R. C. L. Moncure, Executor of the Estate of Charles H. Grogan, Deceased, et al.**

Civ. Nos. 18283, 18585 and 19510.

United States District Court,
D. Maryland.

March 25, 1971.

Anthony C. Liotta, Philip M. Zeidner, Naneita A. Smith, and Stanley J. Fineman, Attys., Lands Division, Dept. of Justice, Washington, D. C., and George Beall, U. S. Atty., Baltimore, Md., for plaintiff.

J. Hampton Baumgartner, Jr., Bruce S. Mencher and Wilkes & Artis, Washington, D. C., Raymond S. Smethurst, Jr. and Adkins, Potts & Smethurst, Salisbury, Md., Franklin Goldstein and Burke, Gerber & Wilen, Baltimore, Md., and Charles J. Sullivan, Jr., of College Park, Md., all for various lot owners.

THOMSEN, District Judge.

In these consolidated condemnation cases, the owners of 134 tracts, embracing over 300 lots in Section A of Ocean Beach, on Assateague Island (Assateague), have joined with the Government in submitting to the court without a jury the determination of just compensation for those tracts.

Assateague is 35 miles long and ranges between one-third of a mile and two miles in width, with 22 shoreline miles in Worcester County, Maryland, and 13 in Virginia. The northern part of the island is separated from the mainland by Sinepuxent Bay, the rest by Chincoteague Bay. The northernmost six miles of Assateague consist of two large tracts of land, which are not involved in these cases. South of those tracts is a state park, two miles long, established by Maryland in the early 1960s. The next 14 miles, from the state park to the Virginia line, are comprised principally of two developments, Ocean Beach and South Ocean Beach. Section A of Ocean Beach is the northernmost section, immediately south of the state park.

The tracts involved in the present submission constitute almost all of the land in Section A not heretofore purchased by the Government. The date of taking was 27 April 1967 for one of the tracts, 25 July 1967 for some, and 22 May 1968 for the others. The act establishing the Assateague Island National Seashore, P. L. 89–195, 79 Stat. 824, 16 U.S.C.A. § 459f–1 et seq., became effective on 21 September 1965.[1]

---

1. A bill for the same purpose introduced in the 88th Congress in September 1963 did not pass.

To establish just compensation for the tracts as of the respective dates of taking, the Government relies primarily on sales of lots on Assateague, in the Ocean Beach and South Ocean Beach subdivisions, during the years 1961–1965. The lot owners contend that the number of such sales was not sufficient to provide a fair basis for determining a fair market value for the lots, and that prices during those years were depressed by special and unusual circumstances, including actions taken by the State of Maryland at the instance of the Secretary of the Interior.[2] The lot owners rely primarily on sales in north Ocean City, Maryland, and Fenwick, Delaware, which the Government argues are not comparable for a number of reasons.

## FINDINGS OF FACT

1. The historical facts set out in the preliminary paragraphs and Findings of Fact Nos. 1–20 in Assateague Island Condemnation Cases Opinion No. 2, 311 F.Supp. 1039, at 1041–1049 (D.Md.1970), are adopted as part of this opinion, and should be read at this point. The history of the ill-fated Assateague Island Bridge Corporation is set out in Findings Nos. 3–32 in Opinion No. 1, 306 F.Supp. 138, at 141–148 (D.Md.1969). Those findings are likewise adopted.[3]

*The Lots*

2. All lots in Section A, as in other sections of Ocean Beach and South Ocean Beach, are 100 ft. x 200 ft. (0.46 acres), except for a few irregularly shaped lots on the bay side.

3. In Section A, 18 projected streets run east and west. The southernmost is Central Park North, which runs along a proposed park; then come, in order, N. 1st St. to N. 17th St.[4]

4. Two north-south streets were projected for the whole length of the development: Baltimore Boulevard, to run parallel to the ocean behind the first blocks of lots, and a dual-lane Coastal Highway, behind the next blocks.[5]

5. Most blocks contain 12 lots, but some contain fewer because of the irregular shoreline of the bay. There are four ocean front lots between each pair of streets. Each of those lots fronts 100 ft. on the beach and runs back 200 ft. to an alley. Of the other lots, some front 100 ft. on east-west streets, some front 100 ft. on north-south streets.

6. The lots in all blocks between N. 6th St. and N. 11th St. in Section A, including lots on the causeway,[6] are commercial lots, permitting hotels, motels and multi-family dwellings, as well as other commercial enterprises. All other lots in Section A are restricted to single-family dwellings.[7] The recorded plats

---

2. The lot owners also argue that if those sales are used at all, recognition should be given to the increase in the value of real estate during the years 1961 to 1967–1968.

3. The Court also adheres to the conclusions of law in those two opinions; both were cited with apparent approval in Owen v. Hubbard, 260 Md. 146, 271 A.2d 672 (1970).

4. N. 18th St. runs along the border of the State Park.

5. In some sections Baltimore Boulevard would be diverted around a park or a parking area between some of the blocks in the commercial area of such section; in other sections, including Section A, it would run through the parking area.

6. See Findings Nos. 26 to 28 in Opinion No. 1, 306 F.Supp. at 147, and the conclusions therein with respect to the causeway lots, 306 F.Supp. at 150–156.

7. Except for a few lots on Washington Boulevard not included in this submission; and lots in blocks 312, 412 and 512, on the north side of the causeway, some of which are included. The areas referred to as Pier Site, Central Park and Harbor Site (see Opinion No. 2, 311 F. Supp. at 1051–1059), are located at the south end of Section A. The Fuel Dock Site is on the south side of the causeway and the Town Hall Site is at the west end of the causeway. The amount to be awarded for those properties is not a part of the present submission.

of the other sections show both commercial and residential lots, but the proportion of commercial lots in Section A is greater than in most other sections, even apart from the large number of commercial lots on the causeway.

7. A boardwalk was projected to run in front of the commercial lots fronting on the ocean. No buildings on the beach or on the beach side of the boardwalk were permitted by the restrictions anywhere in the subdivisions, except in one place, the pier site, at the south end of Section A. See 311 F.Supp. at 1042–1043.

8. The right of lot owners to use the entire beach as a private, community beach, see 311 F.Supp. 1051–1053, was a valuable easement, which must be reflected in the just compensation allowed for each lot.

9. The elevation of the lots in Section A, included in the submission, varies from 2.5 ft. above mean low water (MLW) [8] to 12.1 ft. above MLW.[9] The elevation of the individual lots was important for several reasons, set out in the following findings.

10. Under applicable law and regulations, no building permit would be issued for the installation of a septic tank unless the elevation of the lot was 7 ft. above MLW, in order to assure percolation. In order to have a septic tank, lots with lower elevations would have to be brought up to 7 ft. above MLW by means of fill.

11. Worcester County adopted a regulation in 1963 that buildings would have to have a first-floor elevation at the dune line of 18 ft. above MLW, with lower requirements for properties away from the beach, e. g., 10 ft. above MLW at the highway and 9 ft. above MLW on the bay side.[10]

12. Some of the lots on the bay side contain shallow sloughs, in which water is usually present; some lots are covered by water in whole or in part at normal high tides every day. Many lots are covered by water several times a year, when the tides are much higher than normal.

13. The elevation of the lots on Assateague average somewhat lower than lots in Ocean City, which lies north of the inlet between Assateague and Ocean City cut by a storm in 1933. Some of the property in the Ocean City area also is covered by water when the tides are very high.

*Sales on Assateague*

14. The parties are agreed, and the Court finds, that sales on Assateague before 1961 cannot be considered as "comparable sales" and are of little or no value in determining just compensation for the takings in 1967 and 1968. The lot owners contend that even the later sales are not comparable for various reasons, discussed below, but the Government takes the position that sales of lots on Assateague during the period 1961–1965, subject to appropriate adjustments, furnish the best guide to the value of the lots at the time of taking.

15. During the period of active promotion, 1950–1955, customers were brought from the mainland to the bay side of Section A by a ferry. A road running in the projected bed of Baltimore Boulevard was given a thin macadam surface, which lasted until the 1962 storm, when the road was badly damaged and became impassable for ordinary motor vehicles. After 1955 the Club operated the ferry when needed until the bridge from the mainland to the state park was completed in 1964.

16. The pattern of prices during the period 1950–1955, when 90% of the 5,850

---

8. Some of the evidence refers to elevations as so many feet above mean sea level. Mean sea level at Assateague is 1.7 ft. above mean low water, so 5 ft. above MSL is 6.7 ft. above MLW. All elevations referred to in the evidence with reference to MSL have been translated to so many feet above MLW.

9. Except for a few lots which were entirely under water.

10. The regulation was applicable not only to Assateague, but also to Ocean City, including north Ocean City. The required elevation can be achieved by building on piles or by raising the height of the dunes.

lots were sold, was erratic. The developers sometimes sold adjacent and comparable lots at widely divergent prices, for no apparent reason except what the purchaser could be persuaded to pay.

17. During the next period, 1956–1960, the pattern was dominated by the fluctuating prospects of the Bridge Corporation, including the building of the causeway, and the final abandonment of the bridge project by that corporation. See Findings, 306 F.Supp. at 144–147, and 311 F.Supp. 1047.

18. By 1961, however, the movement for a state bridge was well under way. The Assateague Island Bridge Study Commission had been appointed in 1959.[11] Its report, made in December 1959, recommended immediate construction of a toll bridge from the mainland to the "Proposed State Park". The report was based on a traffic and earnings study, which concluded that traffic would be generated primarily by development of the proposed State Park immediately north of Ocean Beach and by residential and commercial activities in Ocean Beach and South Ocean Beach. The report stated:

"Since it appears likely that the development of the Ocean Beach-South Ocean Beach portion of Assateague Island, upon construction of a bridge, may somewhat parallel that of neighboring Ocean City, considerable study was made of Ocean City and the traffic characteristics of the major highways leading into the area. * * * Considerable reliance was placed upon the experience of comparable facilities which have been in operation for some time. * * * It appears that most land owners are waiting for the construction of a fixed crossing before initiating home construction. * * *"

19. In 1961 the Legislature authorized the State Roads Commission to participate jointly with the State of Maryland and Worcester County in the cost of constructing such a bridge,[12] and authorized the Board of County Commissioners of Worcester County to issue $275,000.00 of bonds for that purpose.[13] On November 24, 1964, the County Commissioners approved a resolution providing for the issuance of such bonds and for the levy of a 90¢ tax (per $100 valuation) on all Assateague Island real estate for the payment of those bonds. The owners of property which has not yet been taken or purchased by the Government were assessed for the payment of those bonds until June 30, 1970.

20. By the end of 1961 some 50 houses had been constructed in Ocean Beach and South Ocean Beach, and the Club, of which most lot owners were members, had commenced its efforts to maintain the barrier dunes at an adequate height.

21. A substantial number of sales of one or more lots on Assateague were made during 1961 and the first two months of 1962, before the March 1962 storm. Aside from a few lots sold at very low prices (for which there is usually an explanation, such as low land) and one or two sales at exceptionally high prices, the sales show a fairly consistent pattern for the various types of lots.

### The March 1962 Storm

22. The entire coastal areas of Maryland and Delaware, as well as parts of Virginia and New Jersey, were flooded for several days during a storm in March 1962. That storm was of a severity which is likely to occur only twice a century, but other severe storms are likely to occur with much greater frequency.

23. The storm destroyed, severely damaged or moved most of the buildings on Assateague and damaged the paved road to such an extent that it was not usable by ordinary vehicles. The barrier dunes all along the coast were seriously damaged; in some areas of Assateague they were nearly destroyed. There was extensive property damage in Ocean City and other coastal areas. The storm had

---

11. Pursuant to Joint Resolution No. 12 of the General Assembly of that year.

12. By Chapter 646 of the Laws of 1961.

13. By Chapter 647 of the Laws of 1961.

a depressing effect on the market, not only for lots on Assateague, but also for property in the Ocean City area.

24. With the assistance of the Corps of Engineers, Ocean City and other developed areas restored their barrier dunes quite rapidly. Property values in the Ocean City area recovered quickly, and moved rapidly upward during the years 1963–1968.

25. Less and later assistance was afforded undeveloped areas, and the resources of the Club were insufficient to maintain the dunes at an adequate level along the entire beach for which the Club was responsible.

26. There were not many sales of lots on Assateague during the years 1963, 1964 and 1965, before the Assateague Island National Seashore Act became law on September 21, 1965. They show some recovery from the prices during the year or so after the March 1962 storm, and the prices in 1964 and 1965, on the whole, do not compare unfavorably with the 1961 prices. But the sales after March 1963 were affected by the wide publicity which the news media gave to the activities of the National, State and County governments, set out in Findings 27 to 36, as well as by the many other problems existing in the years 1963 to 1965 which had to be faced by the lot owners who wished to build on their lots. Those problems are set out in Finding 37(a) to (f).

### Activities of the Federal, State and County Governments

27. In April 1963 the Secretary of the Interior, Stewart L. Udall, forwarded to the then Governor of Maryland, J. Millard Tawes, a report entitled "Assateague Island and Vicinity: Study of Recreation Values and Potential Use", prepared by the Bureau of Outdoor Recreation, recommending public ownership of Assateague Island, either wholly by the United States or in conjunction with the State of Maryland. Shortly thereafter the Secretary visited Assateague.

28. At about this time the State announced that it intended to advertise for bids for the construction of the Assateague Island Bridge. The Secretary publicly urged the Governor not to advertise for bids and to delay construction of the bridge until further consideration could be given to Interior's proposal to create a National Seashore. Nevertheless, the Maryland State Roads Commission advertised for bids. Again, the Secretary publicly asked the Governor not to award a contract, urging by letter dated May 2, 1963, "deferral of the bridge for a year until Congress has had an opportunity to evaluate the legislative proposals that will soon be placed before it to create a National Seashore". In explanation of this request, Secretary Udall stated, in part:

"1. It is our understanding that the State park will not be developed and ready to receive any substantial number of visitors for approximately two years. Therefore, there is no need to build a bridge at this time to provide access to the park. Furthermore, if a bridge were constructed and opened, there very probably would develop health, sanitation, and other management problems as a result of an influx of large numbers of people prior to adequate developments to care for them. * * *

" * * *

"3. The third point is that the building of the planned bridge with public funds at the present time, in view of the uncertain future of the Island, would result in a monetary windfall to present property owners, many of whom purchased these lots for speculative purposes. We think such action would be looked upon with disfavor by the Congress and by the general public."

He concluded by observing that "such action would avoid unnecessary inflation and speculation in land values".

29. The Maryland Board of Public Works [14] decided not to delay construc-

---

14. Composed of the Governor, the Comptroller and the State Treasurer, which operates as the Executive Committee for the State Government.

tion of the Assateague Island Bridge, but required the County Commissioners of Worcester County to impose a moratorium on any building permits for Assateague until the bridge should be completed.

30. At the same time, the Maryland State Department of Health adopted a requirement that all applications for individual sewage disposal systems on Assateague be sent to Baltimore for "review and concurrence" by officials there. The result of this novel requirement was a complete withholding of all sewage disposal permits for Assateague Island.

31. In September 1963, a bill was introduced in the United States Senate for the establishment of Assateague Island as a National Seashore. S. 2128, 88th Congress, 1st Session.[15]

32. In January 1964 the Circuit Court for Worcester County struck down the County's building permit moratorium.[16] However, permits for septic tanks continued to be withheld by the Department of Health. The Circuit Court held in July 1964 that such withholding was illegal,[17] but an appeal was taken and the permits continued to be withheld pending the appeal. See Finding 36.

33. During 1964 the Maryland Board of Public Works conducted hearings to obtain the views of proponents and opponents of the proposed national seashore. In August 1964 the Subcommittee on Public Lands of the Committee on Interior and Insular Affairs of the United States Senate commenced hearings on the proposed legislation. Media coverage of these proceedings was substantial, and the Club sent information about them to all property owners.

34. In September 1964, the Assateague Island Bridge from the mainland to a point just north of the State Park was officially opened to the public. However, at that time there was no improved road from the bridge across the State Park or down the Island. Pressure from property owners developed, and in November 1964 the County Commissioners decided to construct a temporary road across the State Park to tie in with the remains of the surfaced road in Section A, referred to in Findings 15 and 23. But the State Department of Forests and Parks obtained an injunction prohibiting the County Commissioners from planning or constructing any such road.[18]

35. In March 1965, the Subcommittee on Parks and Recreation of the United States Senate held hearings, at which Governor Tawes stated:

"We in Maryland are doing everything legally possible to prevent residential and commercial development on the island. ˙ So far we have been successful, but legal actions are now pending before our courts to require the issuing of building permits for improvements on the island. We are doing our

---

15. That bill did not pass, but the bill which became law was introduced early in 1965.

16. Trimper v. Carter et al., No. 3525 Chancery, Circuit Court for Worcester County.

17. Walker v. State Health Department, No. 3577 Civil, Circuit Court for Worcester County.

18. See Ellis v. Redden et al., No. 8248, Chancery, Circuit Court for Worcester County, Md. (November 1964). In November 1964 the Chairman of the Commission of Forests and Parks stated why the Commission would not permit the County to construct such a road. He said:

"* * * this would encourage residential and commercial development of the Island and would probably have an adverse effect on the attitudes of Congress insofar as passage of the federal legislation in Congress is concerned. * * * We repeat our initial judgment: the fulfillment of Assateague Island as a public park can be best accomplished through the joint effort of the citizens of Worcester County, the State of Maryland and the Department of the Interior."
The State was not willing to impair its position in regard to Maryland's eligibility for federal funds. See $1,000,000 payment to the State of Maryland authorized by Section 3(a), P.L. 89–195.

very best to hold the line but I don't know how long we can prevail." [19]

36. In May 1965, th> Maryland Court of Appeals, in State Health Department v. Walker, 238 Md. 512, 209 A.2d 555, affirmed the decision of the Circuit Court for Worcester County in striking down the State Department of Health's arrangement for the handling of applications for sewage disposal permits on Assateague. Thereafter, the Health Department issued permits to those whose applications met all the regulatory criteria. However, four months later (September 21, 1965) the Act creating the Assateague Island National Seashore became law.

*Other Problems Faced by Lot Owners who Wished to Build on Their Lots*

37. During the years 1961 to 1965, inclusive, apart from the problems created by the State and Federal Governments, the owners of lots on Assateague and prospective purchasers of such lots were faced with serious problems before they could build. Those problems included:

(a) The lack of a public water system, with the consequent need to dig wells if a lot owner wished to build before a public water system could be obtained.

(b) The lack of a public sewage system, with the consequent need to use septic tanks until a public sewage system, or a smaller private or semi-public system serving a substantial number of lots, could be obtained.

(c) Not more than 50% of the lots in any block could be developed with septic tanks. Any greater use of septic tanks would have been likely to result in saturation of the ground and the creation of drinking water problems. The remaining lot owners would have to wait until a sewage system was developed.

(d) Since no building permit would be issued for the installation of a septic tank unless the elevation of the lot was at least 7 ft. above MLW, the owners of lots with lower elevations would have to bring them up to 7 ft. above MLW by means of fill. Dirt for such fills could be hauled to Assateague from the mainland at a cost of about $1.75 per cu. yd., or, with the approval of governmental authorities, could be dredged from Sinepuxent Bay. Until a usable road down the island was constructed, with necessary side roads to most of the lots, such hauling would have been impractical. Dredging operations would have been practical only if a substantial number of lot owners would buy fill at the same time.

(e) Institutions which supply mortgage money would not finance homes and other buildings on Assateague unless and until there were adequate dunes along the beach to protect the Island from normal tides and cyclic storms, such as occur every year. The dunes were inadequate in many places, and the Club was unable to raise sufficient money to make them adequate, although along some stretches of the beach, sand fences had built up reasonably adequate dunes.

(f) The greatest obstacle to development was the fact that there were more than 2,500 lot owners. It would have been extremely difficult, if not impossible, to achieve adequate cooperation. among them to raise the necessary money for orderly development.

*Sales in north Ocean City and Delaware*

The appraisers for the lot owners relied upon sales in north Ocean City and a few sales in Delaware as comparable sales in fixing their values for the lots on Assateague included in the present submission. They testified that they gave consideration to the sales on Assateague, but they used none of them as comparable sales, and the Court finds that they gave little or no consideration to sales on Assateague.

19. Hearings on S. 20 and S. 1121 before the Subcommittee on Parks and Recreation of the Senate Committee on Interior Affairs, 89th Cong., 1st Sess., at p. 27 (1965).

38. The town of Ocean City occupies the entire portion of Fenwick Island south of the Delaware line. The older part of the town lies at the southern end of that island. Many new developments, known by various names, are part of what is often called north Ocean City and will be referred to collectively herein as north Ocean City. All are legally part of the town of Ocean City. Fenwick, Delaware, lies just north of the State line.

39. Ocean City has been for many years an established resort, with many hotels, motels and properties which can be rented. During all material times it has had drug stores, restaurants and other commercial establishments, as well as police and fire protection. North of the Delaware line there are other established resort communities, with similar facilities.

40. All of the properties in north Ocean City and in Delaware referred to by the lot owners and their appraisers have had at all material times access by means of a paved, six-lane highway to the public and commercial facilities in Ocean City and to similar facilities north of the State line.

41. Most of the sales cited by the appraisers for the lot owners were made by two or three large developers, who bought acreage, subdivided it, filled and graded the lots and roads, built lagoons and saw to it that water and sewers would be available to the purchasers of such lots, either before the sales or shortly thereafter. The plans for public water and sewers in the northern sections of Ocean City were either completed or well under way by 1967 and 1968.

42. All of the land east of the Coastal Highway in north Ocean City is zoned to permit hotels, motels and multi-family dwellings. There are few single-family residences east of the Highway, but many motels, condominiums, and smaller multi-family dwellings. The land west of the Highway has been developed by the two or three large developers referred to in Finding 41.

43. The sales in north Ocean City and Fenwick after 1965 show the effect of the taking by the Government of the lots on Assateague and their consequent removal from the market.

### The Time Factor

44. Land values throughout the United States have been rising at a rate of between five and ten percent per annum, and the value of land suitable for recreational use has increased even more rapidly.[20]

45. As a result of the 1962 storm, however, the values of land on Assateague in 1963 did not rise above the 1961 values.

46. Principally because of the acts of the State and Federal Governments looking to the acquisition of Assateague by the Federal Government as a national seashore, including the usual legislative processes as well as the unusual activities set out in Findings 27 to 35, there were relatively few sales on Assateague during the years 1964–1967; and it is

---

20. A report prepared and published by the Department of the Interior in January 1967, by the Bureau of Outdoor Recreation, entitled Recreation Land Price Escalation, stated: "There has been a steady upward trend in land values almost everywhere in the Nation. Land values appear generally to be rising, on the average, from 5 percent to 10 percent annually. And the prices of land suitable for public recreation use and administration are rising at a considerably higher rate."

The report was prepared at the request of President Johnson, who in his "National Heritage Message" to Congress in February 1966, had voiced his concern over the "spiraling cost of land acquisitions by the Federal Government, particularly for water resource and recreational purposes", and had called upon certain officials, including the Secretary of the Interior, "to investigate procedures for protecting the Government against artificial price spirals". The report gave as one of the primary causes of land price escalation "Keen competition between individuals, developers, and public agencies for prime recreation lands, particularly those which are water-oriented".

hard to find a consistent pattern in those sales.

47. If it had not been for the acts of the State and Federal Governments, set out in Findings 27 to 35, the values of the lots on Assateague would probably have begun by the end of 1963 to rise above the 1961 values. However, because of the problems faced by lot owners on Assateague, set out in Findings 37(a) to (f), 48 and 49, the rate of increase on Assateague would have been less than the rate of increase in north Ocean City during the years 1964–1968.

48. If the Act creating the Assateague Island National Seashore had not been adopted in September 1965, lot owners and prospective purchasers of lots on Assateague might reasonably have expected that an adequate road would have been built by the County across the State Park and down the Island before 1967, and that some one-family residences, some motels, and a few stores would probably have been built by the dates of taking in 1967–1968. They could not reasonably have expected any considerable amount of mortgage money to have been available until the sand dunes were brought to and maintained at a satisfactory height. They could not reasonably have expected any public sewer system by 1968,[21] although a small private or semi-public sewage treatment plant for a group of lots might have been practicable. Not more than half of the lots in a block would have been permitted by the County to have septic tanks, and the construction of septic tanks would have required more or less fill on many lots. It would have been necessary to build lateral roads and solve water problems.

49. The greatest obstacle to development would still have been the fact that there were over 2,500 lot owners. It would have been extremely difficult, if not impossible, to achieve adequate cooperation among them to raise the money necessary for orderly development. They had had great difficulty in building up the dunes after the March 1962 storm, and had not been able to make the road passable. Some of the lot owners were disillusioned. Others wanted to keep up the fight, and with the help of the County authorities they could have accomplished something by 1967–1968. But they could not have made the market value of their lots anywhere near the values estimated by their appraisers.

### *Highest and Best Use*

■ In Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934), the Supreme Court stated at page 255, 54 S.Ct. at page 708:

"Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use af-

---

21. The applicable law permitted the creation of Sewer Districts and the issuance of bonds, secured by assessments on the property owners served. Anno.Code of Md., Art. 43, § 645 et seq. (1965 Repl. Vol. & 1970 Supp.). Any common facility on Assateague could be developed only by the concurrence of a significant number of lot owners. Governmental action, such as the creation of a Sewer District, would have required concerted effort by the lot owners. North Ocean City has many multi-family residential units. Since most of the lots on Assateague were restricted to single-family units, the cost of a sewage disposal system would probably have been higher per family on Assateague than in north Ocean City.

fects the market value while the property is privately held. * * * " [22]

Although many of the lots in Section A were shown on the plat as commercial lots (permitting use for motels, multi-family dwellings and commercial uses), it probably would have been a long time before there would have been any considerable demand for stores and other commercial uses other than motels and multi-family dwellings.[23]

### Acts of the Federal and State Governments

The principal legal problem in this case is the effect that should be given to the actions of the State of Maryland, which were induced to a considerable extent by the Secretary of the Interior, and were intended to prevent any building on Assateague during the years 1963–1965. See Findings 27 to 35.

The lot owners argue that the effect of those actions was so great that it made the sales of lots on Assateague during those years inherently unreliable as an index to the value of their lots in 1967–1968.[24]

The Government, on the other hand, argues that those actions of the State were mere "incidents of ownership"; that they were taken for a variety of reasons,[25] including the preservation of the health of the people who might build on the Island, unconnected with the possible acquisition by the Government; and that the cases relied on by the lot owners are not in point.

The Court concludes that in the context of the present case the consequences of those actions should not be ignored or dismissed as "incidents of ownership". It would be unfair to permit the condemning agency to depress property values, directly or indirectly, by interfering with the property owners' rights to use their land, and then take advantage of such depression to reduce the price which it must pay for the property. In United States v. Virginia Electric & Power Company, 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961), the Court said:

> "* * * The court must exclude any depreciation in value caused by the prospective taking once the Government 'was committed' to the project. * * * Accordingly, the impact of that event upon the likelihood of actual exercise of the easement cannot be considered. As one writer has pointed out, '[i]t would be manifestly unjust to permit a public authority to depreciate property values by a threat * * * [of the construction of a government project] and then to take advantage of this depression in the price which it must pay for the property' when eventually condemned. 1 Orgel, Valuation under Eminent Domain, § 105, at 447 (2d ed.); see Congressional School of Aeronautics Inc. v. State Roads Commission, 218 Md. 236, 249–250, 146 A.2d 558, 565." [26] 365 U.S. at 636, 81 S.Ct. at 792.

22. See also 4 Nichols, Eminent Domain, (3d ed.), § 12.314; 1 Orgel, Valuation under Eminent Domain (2d ed.), § 30, at 141; United States v. Benning, 330 F.2d 527 (9 Cir. 1964).

23. See Olson v. United States, supra; United States v. Certain Land in Baltimore County, 209 F.Supp. 50 (D.Md. 1962); United States v. 1,108 Acres of Land, 204 F.Supp. 737 (E.D.N.Y.1962).

24. They cite United States v. Meadow Brook Club, 259 F.2d 41 (2 Cir. 1958), cert. denied, 358 U.S. 921, 79 S.Ct. 290, 3 L.Ed.2d 239; Drakes Bay Land Company v. United States, 424 F.2d 574 (Ct. Claims 1970); Board of Com'rs of State

Institutions v. Tallahassee B. & T. Co., 108 So.2d 74 (Fla.App.1959); Jarrott v. Scrivener, 225 F.Supp. 827 (D.D.C.1964).

25. See the majority and dissenting opinions in State Dept. of Health v. Walker, 238 Md. 512, 209 A.2d 555 (1965), and Finding No. 36 herein.

26. See also the cases cited in fn. 24, above, and In re Inwood Hill Park, 230 App.Div. 41, 243 N.Y.S. 63 (1930), aff'd 256 N.Y. 556, 177 N.E. 138 (1931); Carl M. Freeman Associates, Inc. v. State Roads Commission, 252 Md. 319, 220 A.2d 250 (1969); City of Baltimore v. United Five & Ten Cent Stores, Inc., 250 Md. 361, 243 A.2d 521 (1968); Congressional

■ The governmental actions set out in Findings 27 to 35 should be considered by the Court in determining the weight which should be given to the 1963–1965 sales of lots on Assateague; but they do not require that those sales should be disregarded.

The lot owners contend that the adjustments which must be made to the Assateague sales for a variety of reasons makes it necessary to resort to comparable sales elsewhere.[27]

■ The Court agrees that consideration should be given to sales in north Ocean City and Fenwick, cited by the appraisers for the lot owners. But the Court finds and holds that the comparability of those sales and the weight to be given them is greatly reduced by the evidence in this case, namely; that at the time those sales were made, the properties had the benefit of a six-lane paved highway running to established developments both to the north and to the south, with drug stores, restaurants, and other commercial establishments, fire protection and police protection, and water and sewers either already available or promised by the substantial developers who made most of the sales. See Findings Nos. 39 to 43.

The lot owners argue that there was no physical reason why the development which occurred in north Ocean City during the middle and late 1960s could not have occurred on Assateague. It is true that the topography of the two regions is much the same; but the lot owners overlook the problems set out in Findings 37, 48 and 49.[28]

*Ultimate Findings and Conclusions*

■ Voluntary, "arms-length" sales of lots on Assateague during the year 1961 and in the first two months of 1962 were sufficient in number and made under such conditions as to be worthy of consideration in this case, subject to proper adjustment for the time factor, i. e., the increase in land values, particularly recreational land values, over the years, and the other factors set out in the findings and conclusions herein.

These factors, favorable and unfavorable, with respect to the feasibility of constructing houses, motels or stores on Assateague, were evident in 1961 and affected the value of the lots. Most of them, both favorable and unfavorable, would have continued in 1967 and 1968, if there had been no taking. There would probably have been an improved road down the Island by 1967–1968,[29] and probably a public water supply and street lighting. But the lot owners would still have been faced by the problems caused by the lack of one or more developers of a considerable number of contiguous lots, the difficulty of getting the many lot owners to agree on how to obtain and how to spend the money neces-

School of Aeronautics, Inc. v. State Roads Commission, 218 Md. 236, 146 A.2d 558 (1958); Symonds v. Bucklin, 197 F. Supp. 682 (D.Md.1961).

27. The lot owners rely on such cases as United States v. 25.406 Acres of Land, etc., 172 F.2d 990 (4 Cir. 1949), cert. den. 337 U.S. 931, 69 S.Ct. 1496, 93 L.Ed. 1738 (1949); United States v. Lowrie, 246 F.2d 472 (4 Cir. 1957); United States v. 124.84 Acres of Land, Warrick County, Ind., 387 F.2d 912 (7 Cir. 1968); United States v. 60.14 Acres of Land, 362 F.2d 660 (3 Cir. 1966); Hays v. State of Texas, 342 S.W.2d 167 (Tex.Civ.App. 1960); Knollman v. United States, 214 F.2d 106 (6 Cir. 1954); United States v. Benning, 330 F.2d 527 (9 Cir. 1964).

28. This case is different from the *Bodie Island* case [United States v. Bodie Island], 262 F.Supp. 190 (E.D.N.C.1967), cited by the lot owners. In that case (1) the Court found it necessary to utilize sales outside the subject area because there were no recent sales therein; in our case there was a substantial number of sales on Assateague itself in the recent past; and (2) the sales outside the subject property used for comparison were at the same stage of development and had the same potential uses as the subject properties.

29. Lateral roads and the necessity of bringing in fill for many of the lots would still have presented problems.

sary to raise and maintain the dunes at a height sufficient to satisfy mortgage lenders, and how to obtain an adequate sewage system.[30] On the other hand, the location of Assateague near Baltimore, Washington and other cities, the size of the lots, the high quality of the beach, and the right of each lot owner to use the entire beach as a private, community beach, would have remained as favorable factors.

After viewing the tracts and considering all the evidence, the Court finds that an adjustment at the rate of about 50% should be made to bring 1961 values of land on Assateague up to 1967–1968 values. With such a time adjustment, and suitable adjustments for special situations set out below, the Court finds that the voluntary arms-length sales of lots on Assateague in 1961 and in 1962 before the storm may generally be regarded as the best guide to what is just compensation in this case.

### Valuation of Lots and Tracts

The Court has placed the lots to be valued in this case in several categories and sub-categories, has made an allowance for common ownership of two or more adjacent lots, has provided for certain adjustments, downward based on low elevation and upward based on the presence of a well, and has treated a few tracts as special situations.

#### (A) Elevations [31]

I. The valuations set out in (B) below are for lots with elevations of 6 ft. or more above MLW.

II. For lots with elevations between 4 ft. and 5.9 ft. above MLW, deduct $500 per lot from the amounts stated in the schedule.

III. For lots with elevations between 2 ft. and 3.9 ft. above MLW, deduct $1,000 per lot from the amounts stated.

IV. For lots with elevations less than 2 ft., deduct $1,250 per lot from the amounts stated.[32]

#### (B) Categories

As indicated in (A), above, the following valuations are for lots with elevations of 6 ft. or more above MLW.

I. Ocean front

  (a) Residential

  (1) Corner lots    $7,500

  (2) Other    $7,000

  (b) Commercial

  (1) Corner lot    $8,500

  (2) Other    $8,000

II. From the alley behind the Ocean front lots to the east side of Baltimore Boulevard.

  (a) Residential

  (1) With side on alley (first lot behind ocean front)    $3,500

  (2) Other    $3,000

  (b) Commercial

  (1) With side on alley (first lot behind ocean front)    $4,000

  (2) Facing on Baltimore Boulevard or Park Lane    $4,000

  (3) Other    $3,500

III. From west side of Baltimore Boulevard to east side of Coastal Highway.

  (a) Residential    $2,500

  (b) Commercial

  (1) Facing on Baltimore Boulevard or Park Lane    $3,750

  (2) Facing on Coastal Highway [33]    $3,000

  (3) Other    $2,500

---

30. See note 21.

31. The elevations of the lots can be estimated with reasonable accuracy to a tolerance of 1 ft.

32. These deductions are less than the cost of bringing the lots up to an elevation of 7 ft. above MLW, but the sales during and after 1961 do not warrant greater deductions.

33. Although lots on the dual lane Coastal Highway might ultimately have been more valuable than lots on Baltimore Boulevard, the latter would probably have been built first.

IV. Coastal Highway to Bay, except Blocks 521, 531, 541, 551.[34]

| | |
|---|---|
| (a) Residential | $2,250 |
| (b) Commercial | |
| (1) Facing dredged harbor or fuel dock | $4,000 |
| (2) Facing on Coastal Highway | $3,000 |
| (3) Other | $2,250 |
| Block 521 | $3,500 |
| Block 531 | $3,750 |
| Block 541 | $4,000 |
| Block 551 | |
| The 2 westernmost lots | $6,500 |
| Other lots in 551 | $4,250 |

*(C) Other Additions*

I. Common ownership of two or more adjacent lots.

(a) Ocean front, $500 per lot

(b) Other, $250 per lot

II. For a well, add $750.

*(D) Special Situations*

| | |
|---|---|
| Tract 1–1 | $49,500 |
| Tract 1–144, Lots 1 and 2 in Block 111. Lot 1 is one of the two commercial lots on Coastal Highway first reached by driving south from the bridge [35] | $7,500 |
| Tract 1–148, Lots 9 and 10 in Block 111. Lot 9 is one of the two commercial lots on Baltimore Boulevard first reached by driving south from the bridge [36] | $7,500, plus $750 for a well |

That part of Tract 1–135 lying west of Philadelphia Avenue and north of N. 11th Street, designated as Parcel 1 on Government Exhibit 4    $5,000

That part of Tract 1–135 lying west of Philadelphia Avenue and south of N. 10th Street, designated as Parcel 2 on Government Exhibit 4    $5,000

Counsel should agree upon an appropriate judgment order.

---

34. The fact that most of the lots on the causeway have a common ownership would make it feasible for these lots to have been developed sooner than other lots on the Island.

The high prices paid for some lots on the causeway in 1958 were caused by the expectation that the bridge would be built in that area, and that those lots would therefore have exceptional value for various commercial purposes. Since the bridge was built elsewhere, those hopes had been disappointed long before 1965, as is evident from the sales of causeway lots in 1961 and thereafter.

On the other hand, some of the causeway lots provide fine views of the bay, which would make them attractive for motels and restaurants, as well as private dwellings. Other causeway lots have extra value because of their proximity to the dredged harbor.

The fact that the title to the causeway land created by fill is a base fee rather than fee simple, see 306 F.Supp. 150–156, makes no substantial difference in the valuation of the tracts.

35. The other similar lots have been purchased by the Government.

36. The other similar lots have been purchased by the Government.