731 F.2d 1443
 UNITED STATES of America, Plaintiff-Appellee,
v.
760.807 ACRES OF LAND, MORE OR LESS, SITUATE IN the CITY AND
COUNTY OF HONOLULU, STATE OF HAWAII; F.E. Trotter, Inc.,
W.H. McVay, Inc., P.R. Cassiday, Inc., and H.C. Cornuelle,
Inc., Trustees under the Will and of the Estate of James
Campbell, Deceased, Defendants-Appellants.
 No. 83-1991.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 2, 1984.
Decided May 1, 1984.
 
 Thomas P. Carolan, Atty. U.S. Dept. of Justice, Washington, D.C., Albert M. Ferlo, Jr., Martin W. Matzen, Robert C. Klarquist, Washington, D.C., for plaintiff-appellee.
 Francis P. Hogan, Clinton R. Ashford, Charles B. Dwight, II, Honolulu, Hawaii, for defendants-appellants.
 Appeal from the United States District Court for the District of Hawaii.
 Before: CHOY, GOODWIN and KENNEDY, Circuit Judges.
 CHOY, Circuit Judge:
 
 
 1
 In September 1980, the United States brought this condemnation action to acquire an "Explosive Safety Hazard Zone" (ESHZ) around wharves used to load and unload explosives. Appellants, the Trustees under the Will and of the Estate of James Campbell, Deceased ("Trustees of the Campbell Estate"), held title to most of the acquired land. After a separate trial involving only Campbell Estate land, a jury awarded the Trustees $14,500,000. The Trustees appeal, contending that the amount of the compensation was inadequate. We affirm.
 
 I. Background
 
 2
 In Hawaii, all loading and unloading of military ammunition ships, and of civilian ships with large cargoes of explosives, are done on two wharves on the West Loch Branch, located on the western shore of Pearl Harbor. In September 1980, the United States brought this action to condemn all land within 7405 feet of these wharves to create an ESHZ, which is a buffer zone designed to protect against possible deaths, personal injuries, and property destruction from an accidental detonation of explosives at the wharves. The United States acquired land belonging to several owners, including roughly half of a 1650.702 acre parcel of Campbell Estate land.
 
 
 3
 At trial, both the Trustees and the Government attempted to value the acquired land by finding the difference between the value of the large parcel immediately before the taking and the value of the "remainder," the land not taken, immediately after the taking. Using this method, any diminution in value of the remainder resulting from the taking and use of part of the original parcel, sometimes termed "severance damages," would be included in the award.
 
 
 4
 Fifty years ago, the Navy took land from the Trustees, or their predecessors in interest, to construct a naval ammunition depot. In 1941, the Navy took more land for additional ammunition storage facilities. Neither party disputed the fact that ships loaded and unloaded explosives at the West Loch Branch both before and after the condemnation. The Trustees' major contention at trial, however, was that the condemnation of an ESHZ had made the public aware of the hazards of explosives at the West Loch Branch, causing an immediate, sharp diminution of the market value of the remainder.
 
 
 5
 In particular, the Government's and the Trustees' appraisers agreed that the highest and best use of the large parcel before the taking was for development of a residential subdivision, although the land was then and is currently zoned for agricultural use. When the appraisers valued the remainder, however, their views diverged. Mr. Rhodes, the Trustees' appraiser, contended that the part of the remainder within 10,000 feet of the wharves would not be developed for residential use because of the hazards associated with explosives. Consequently, he concluded that the highest and best use of that part of the remainder was large-scale agriculture. Ms. Hambleton, the Government's appraiser, concluded that the taking would have no adverse affect on the market value of the remainder since the wharves had existed on the adjoining property for approximately fifty years. She reasoned that any depression in value of the property due to the presence of the wharves was also present before the ESHZ was taken.
 
 
 6
 When the jury was charged, Judge King gave the following instruction on severance damages:You should first determine the fair market value of the entire 1650-plus acres immediately before the taking, and the fair market value of the remaining 889 acres not taken immediately after the taking. The difference will necessarily include and reflect all severance damages. In determining market value before and after, please bear in mind that the highest and best use of the remaining property not taken may be different from the highest and best use of the entire property immediately before the taking.
 
 
 7
 In considering whether severance damages exist, you are instructed that elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, must be excluded from consideration.
 
 
 8
 (Tr. at 1157.) The jury's verdict of $14,500,000 accepted completely Ms. Hambleton's appraisal. The jury specifically found, in response to a special interrogatory, that the market value of the remainder was not diminished by the taking.
 
 
 9
 The Trustees now challenge the jury instruction quoted above as well as several evidentiary rulings. They also contend that the verdict lacks evidentiary support. We hold that the last paragraph of the jury instruction on severance damages was erroneous, but that no reversible error was committed because the Trustees did not present sufficient evidence to show that the taking of the ESHZ caused any diminution in the market value of the remainder.
 
 
 10
 II. Reasonable Probability of Hazard vs. Reasonable Fear
 
 
 11
 When the Government condemns private property for a public purpose, it must pay just compensation for that property. Just compensation means the monetary equivalent of the property taken, and the federal courts have employed the concept of "fair market value" to determine the condemnee's loss. United States v. 564.54 Acres of Land, 441 U.S. 506, 510-11, 99 S.Ct. 1854, 1856-57, 60 L.Ed.2d 435 (1979); Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 473-74, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973).
 
 
 12
 In determining fair market value, courts consider all facts and circumstances that would reasonably influence the price agreed upon by a reasonable seller willing but not obliged to sell and a reasonable buyer willing but not obliged to buy. See, e.g., United States v. 429.59 Acres of Land, 612 F.2d 459, 462 (9th Cir.1980); United States v. Smith, 355 F.2d 807, 809 (5th Cir.1966); 4 Nichols, Law of Eminent Domain Sec. 12.2 (rev. 3d ed. 1981). Accordingly, courts appropriately consider evidence regarding the highest and best use to which the land is put or reasonably may be adapted in the future, United States v. Benning, 330 F.2d 527, 531 (9th Cir.1964), as well as any facts which would naturally influence a person of ordinary prudence desiring to purchase. 4 Nichols, supra, Sec. 12.2, at 12-96. Further, we assume that buyers or sellers of ordinary prudence are knowledgeable and not motivated by speculation or conjecture. See Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934).
 
 
 13
 The Trustees contend that the court below erred in stating that evidence relating to fear of a hazard must be disregarded if the hazard, "while within the realm of possibility, [is] not shown to be reasonably probable." While the challenged instruction is drawn nearly verbatim from Olson v. United States, 292 U.S. at 257, 54 S.Ct. at 709, the Trustees argue, and we agree, that it was misleading in this particular context. The Trustees argue that evidence of fear of a hazard should be considered, regardless of the objective likelihood of the dangerous event occurring, if the fear affects market value.
 
 
 14
 Our cases have suggested that effect on the marketplace is the paramount concern in valuation. In United States v. Benning, 330 F.2d 527, 532 (9th Cir.1964), this court stated that "a potential future use of condemned property should be considered not as the present measure of value but only to the extent that the prospect of demand for such use would have affected the price a willing buyer would have offered for the property ...." Further, in Oregon Mesabi Corp. v. C.D. Johnson Lumber Corp., 166 F.2d 997, 1001 (9th Cir.1947), cert. denied, 334 U.S. 837, 68 S.Ct. 1494, 92 L.Ed. 1762 (1948), we said that "it is the hazard of fire not the reasonable certainty of its occurrence which is the damage which must be compensated."
 
 
 15
 In a case involving a condemnation of an easement for high-voltage power lines, the Sixth Circuit has held:
 
 
 16
 [I]n final analysis, we are concerned only with market value. Although these studies may show objectively the complete safety of these structures, we are not convinced that certain segments of the buying public may not remain apprehensive of these high voltage lines, and therefore might be unwilling to pay as much for the [adjacent] property as they otherwise would.
 
 
 17
 United States ex rel. TVA v. Easement and Right of Way, 405 F.2d 305, 309 (6th Cir.1968). We hold, in accord with the law of most states, that if fear of a hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, diminution in value caused by that fear may be recoverable as part of just compensation. See West Virginia Pulp & Paper Co. v. United States, 200 F.2d 100, 102 (4th Cir.1952); Willsey v. Kansas City Power & Light Co., 6 Kan.App.2d 599, 605-07, 631 P.2d 268, 273-74 (1981). Our requirement that the fears affect the actions of knowledgeable and prudent sellers and purchasers is dictated by Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934), which precludes severance damages for fears based wholly on speculation and conjecture. It is also consistent with the holdings of most state courts that fears must be "reasonable" or "founded on practical experience" in order to be compensable. See, e.g., Willsey, 6 Kan.App.2d at 605-07, 631 P.2d at 273-74.
 
 
 18
 The Government argues that all of the foregoing cases are distinguishable because they all involved fear from uses to which the property being condemned was to be put. This case, the Government asserts, involves fear from a preexisting use of property adjoining the condemned land which allegedly was publicized by this taking. The Government's observation may be correct but properly pertains to other issues, to which we now turn.
 
 III. Use of the Condemned Land
 
 19
 When a portion of a tract of land is taken under the power of eminent domain, the owner is entitled to compensation for the diminution of the value of the remainder resulting from the taking. This compensable diminution in value is often, but loosely, referred to as "severance damages." United States v. Miller, 317 U.S. 369, 376, 63 S.Ct. 276, 281, 87 L.Ed. 336 (1943); Miller v. United States, 620 F.2d 812, 828, 223 Ct.Cl. 352 (1980). Generally, severance damages are recoverable if the devaluation of the remainder results from the condemnor's use of the part taken, but such damages are not recoverable if they result solely from the condemnor's use of another owner's land. United States v. 15.65 Acres of Land, 689 F.2d 1329, 1331-32 (9th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1435, 75 L.Ed.2d 793 (1983). If they result from the use of both, severance damages are recoverable only under a three-part test set out in United States v. Pope & Talbot, Inc., 293 F.2d 822, 825 (9th Cir.1961). Id. at 1332.
 
 
 20
 To the extent the Trustees are contending that they are entitled to severance damages because of the hazard caused by the Government's use of the West Loch wharves, their contention cannot be sustained. In Pope & Talbot, we held that no severance damages could be recovered for a hazard when "it is not the government's use of the lands taken from appellee which has created this hazard. It is the use which, it is anticipated, the government will make of its own [lands] which has caused this element of depreciation." 293 F.2d at 826. Here, the alleged severance damage, if resulting from any use, could not be caused by any use of the condemned property. Indeed, that property is set aside as a buffer zone so no activity can be conducted upon it. Recovery on that theory is therefore precluded.
 
 IV. Causation
 
 21
 The Trustees attempt to sidestep the Pope & Talbot rule by asserting that their damage does not result from any use of the taken property. Rather, the Trustees assert that the taking itself caused the diminution in value of their remainder property because the taking publicized the presence of the nearby West Loch wharves.
 
 
 22
 "Severance damages" are compensable only if the landowner incurs a direct loss reflected in the marketplace that results from the taking. United States v. 10.0 Acres, 533 F.2d 1092, 1095 (9th Cir.1976) (easement); see Baetjer v. United States, 143 F.2d 391, 396 (1st Cir.), cert. denied, 323 U.S. 772, 65 S.Ct. 131, 89 L.Ed. 618 (1944). Since the landowner has the burden of proof in establishing severance damages, Miller v. United States, 620 F.2d 812, 828, 223 Ct.Cl. 352 (1980); United States v. Smith, 355 F.2d 807, 809 (5th Cir.1966); see United States v. Honolulu Plantation Co., 182 F.2d 172, 179 (9th Cir.), cert. denied, 340 U.S. 820, 71 S.Ct. 51, 95 L.Ed. 602 (1950), the landowner must demonstrate that the taking caused the severance damages. We hold that the Trustees have not presented a prima facie case of causation and therefore are not entitled to severance damages.
 
 
 23
 The Trustees' theory of the case was this: (1) Previously, the public had been unaware of the existence of the wharves, but the taking of an ESHZ revealed the hazards to the public; and (2) attendant fear of explosive hazards would cause the public to inquire into the adequacy of the ESHZ, and the public would conclude that the 7405-foot zone was inadequate. Support for the second prong of the Trustees' case is entirely lacking.
 
 
 24
 The Government just as easily could have argued that the taking of an ESHZ would give the public confidence that the land not taken is safe from explosive hazards. That confidence could very well have increased the value of the remainder. The Trustees avoided this pitfall by attempting to show that the protection afforded by the ESHZ was "woefully inadequate." The Trustees have not, however, presented any evidence showing that the asserted inadequacy of protection was reflected in the marketplace.
 
 
 25
 The Trustees' attempt to connect inadequacy of protection to valuation was provided by Mr. Rhodes, the Trustees' appraiser, who drew a 10,000-foot arc around the West Loch wharves and said that the land within could not be developed because "[y]ou're in a situation where you have knowledge that that arc, the 7400-foot arc, is not really the maximum safety arc. So why get into trouble? Why buy trouble?" (Tr. at 944.) Instead of relying upon market surveys or other data that showed that the public was unconvinced of the adequacy of the 7405-foot zone, however, Rhodes picked a 10,000-foot arc by relying on the opinion of another expert, Ms. Napadensky, who testified that a 10,000-foot zone around the wharves, rather than the 7405-foot zone actually taken, would have to be taken to provide "acceptable" protection.
 
 
 26
 Mr. Rhodes' use of the 10,000-foot arc cannot be sustained. First, the Trustees made no attempt to address the question of whether "acceptable" protection to Ms. Napadensky would be acceptable to the real estate market. Second, Ms. Napadensky formed her opinion by assembling information not available to the public generally. Mr. Rhodes testified that, at least before the ESHZ was established, knowledgeable buyers would be unlikely to consult an explosives expert, as the Trustees did:
 
 
 27
 A. As a knowledgeable buyer I would, yeah, I'd probably inquire around, and I've learned, well, there's a naval magazine, and all of the information that was available, nothing indicated there was any danger. In other words, it's a government reservation; it's quite large; you assume the government is operating a safe operation out there.
 
 
 28
 ....
 
 
 29
 Q. And the fact that it's a facility for the handling of munitions wouldn't--you'd pursue your investigation no further, is that your testimony?
 
 
 30
 A. Well, it's quite a long ways over to where the docks are, and you just think obviously they must be operating with some kind of safety standards. So I think you'd have to say the government would be operating a safe operation.
 
 
 31
 Q. So you wouldn't bother to hire a John Connelly or a George Ornellas or a Hyla Napadensky?
 
 
 32
 A. No, I don't think that you would, because you would have no inkling that there would be anything unusual or anything wrong.
 
 
 33
 (Tr. at 979-80.) Mr. Rhodes gave no reason why knowledgeable buyers would suddenly become fearful of explosive hazards and conduct extensive inquiries about the adequacy of the blast zone once the ESHZ was taken.
 
 
 34
 In sum, the Trustees presented insufficient evidence indicating that the presence of an ESHZ, which after all was created to ease public fear of explosive hazards, in fact intensified fear in the marketplace. There is thus no demonstrated causal link between the taking of the ESHZ and the severance damage of which the Trustees complain.
 
 V. Conclusion
 
 35
 The Trustees have not made out a prima facie case of entitlement to severance damages. Judge King's erroneous charge still allowed the jury to find severance damages, which it refused to do. There was no prejudicial error.
 
 
 36
 We have considered the other claims raised by the Trustees and find them to be without merit.
 
 
 37
 AFFIRMED.