UNITED STATES of America, Plaintiff,

v.

104 ACRES, MORE OR LESS, situated IN KEELER TOWNSHIP, VANBUREN COUNTY, MICHIGAN, and Dukesherer Farms, Incorporated, a Michigan corporation, Defendants.

No. K83-468.

United States District Court,
W.D. Michigan, S.D.

July 24, 1987.

Donald Daniels and Anne V. Tuuk, Asst. U.S. Attys., W.D. Mich., Grand Rapids, Mich., for plaintiff.

Kurt D. Hassberger, Rhoades, McKee & Boer, Grand Rapids, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

This is a land condemnation proceeding in which the United States and the only party claiming an interest in the condemned land, Dukesherer Farms, Inc., dispute the value of the land, or right to use the land, that the United States has taken. The United States has taken 1.87 acres (more or less) of the land in fee simple, and has subjected an additional 102.13 acres (more or less) of the land to a perpetual restrictive easement that limits the landowners use of the property. The Court conducted a three-day bench trial on the matter on June 1st, 2nd, and 3rd, 1987, during which it listened to the testimony of three expert witnesses and received into evidence seventeen exhibits. The United States argues, and sought to prove at trial, that the value of the taking, measured as of the date of the taking (September 16, 1983), was $70,000. Defendant argues, and sought to prove at trial, that the value of the taking, measured as of the date of the taking, was $292,500. For the reasons discussed below, the Court finds that the value of the taking, measured as of the date of the taking, was $233,994, and will enter a judgment in defendant's favor in the amount of $163,994.00, plus statutory interest. The following opinion constitutes the Court's findings of fact and conclusions of law in accordance with rule 52(a) of the Federal Rules of Civil Procedure.

## Background and Factual Summary of the Case

The United States filed its complaint in this matter on September 16, 1983, seeking to condemn portions of defendant's property. In particular, as stated above, the United States requested title in fee simple to 1.87 acres of defendant's property, and sought a perpetual restrictive easement as to an additional 102.13 acres of defendant's property. The United States needs the land to operate and to maintain a VORTAC facility, which the Federal Aviation Administration uses to provide navigational guidance to aircraft. The 1.87 acres taken in fee simple provide a site for the facility and an access road to it. The 102.13 acres subject to a perpetual restrictive easement provide a clear area of noninterference with the facility's signal. The easement essentially precludes the landowner from constructing, operating, or maintaining structures and other objects within the easement area that may interfere with this signal. The landowner can continue to cultivate the land and to raise crops on it, and it can operate within the easement area "[a]ll moving farm machinery (exclusive of irrigation systems) while ... [employed in] plant[ing], fertiliz[ing] and/or harvest[ing] crops." Declaration of Taking, Schedule C, para. b. Defendant does not contest the United States' right to take the subject property, and the parties agree that the complaint accurately describes the easement and the fee interest the United States has acquired.

Contemporaneously with its filing of the complaint, the United States filed a Notice of the Taking and a Declaration of Taking. It also deposited the sum of $70,000 with the Court as its estimate of the just compensation due the defendants. I note here that although the United States named six defendants in its complaint, only Dukesherer Farms, Inc. claims a monetary interest in the property and appeared in court to contest the United States' valuation of the land. On September 23, 1983 the Court ordered defendants to surrender possession of the land to the United States on or before October 23, 1983. On August 25, 1986, the Court, pursuant to a stipulation and agreement entered into by the parties, ordered the Clerk of the Court to release the $70,000 the United States had deposited on September 16, 1983, plus the interest that had accrued on such sum, to Dukesherer Farms, Inc. If the Court finds that the value of the taking is more than $70,000, than it must "enter judgment against the United States for the amount of the deficiency." 40 U.S.C. § 258a; *see also* Federal Rule of Civil Procedure 71A(j).

Before the taking, defendant Dukesherer Farms, Inc. ("defendant") used the condemned land to raise corn. After the taking, defendant can continue to use the land, with the exception of the 1.87 acres taken in fee simple, to raise corn. The parties agree that the highest and best use of the land is for cropland. The parties' disagreements in this matter are twofold. First, they disagree on the number of acres affected by the taking; in particular, by the restrictive easement. Second, they disagree about the taking's effect on the fair market value of those acres. Plaintiff argues that the restrictive easement affects only 120 acres of cropland. It also argues that the easement's effect is to decrease the value of defendant's entire holdings (666.7 acres) by one hundred dollars an acre, leading to a total loss to defendant of approximately $70,000. Defendant argues that the restrictive easement affects 195 acres of cropland. It also argues that the easement's effect is to decrease the value of those acres by $1,5000 per acre, leading to a total loss to it of approximately $292,500.

The parties' disagreement concerning the easement's effect on the land's value is based primarily on their differing understandings of the effect of the easement's restriction on defendant's ability to irrigate its property using a center pivot irrigation system. The easement's height limitations prevent defendant from irrigating a substantial portion of the affected area, if not all of it plus some additional acreage, with a center pivot irrigation system. Instead, it must use a traveling gun irrigation system, which produces about forty bushels of corn per acre less than the center pivot

system. Plaintiff argues that the present value of the loss defendant will suffer due to this restriction is $70,000. Defendant argues that the easement's restriction on irrigation diminishes the value of the land by $1,500 per acre, for a total present value diminution of $292,500. The parties also disagree on the before taking value of the land, with plaintiff arguing that it was $2,100 per acre and defendant arguing that it was $2,600 per acre. The nub of the parties' disagreement on defendants' loss, however, is the monetary effect of the irrigation restriction.

### Legal Standards

■■■ A landowner is entitled to receive just compensation whenever the Untied States takes any of his property for public use. U.S. Const. amend. V; *United States v. 50 Acres of Land*, 469 U.S. 24, 25–26, 105 S.Ct. 451, 452–53, 83 L.Ed.2d 376 (1984). In most cases, just compensation means "the fair market value of the property on the date it is appropriated." *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 10, 104 S.Ct. 2187, 2194, 81 L.Ed.2d 1 (1984); *see also Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708–09, 78 L.Ed. 1236 (1934) (a landowner is entitled to receive "the market value of the property at the time of the taking contemporaneously paid in money"). In determining this fair market value, a court must consider what a rational seller, willing but not obliged to sell, would take for the property, and what a rational buyer, willing but not obligated to buy, would pay for the property, and must take into account "[a]ll considerations that might fairly be brought forward and given substantial weight in bargaining between an owner willing to sell and a purchaser desiring to buy." *United States v. 1,291.83 Acres of Land*, 411 F.2d 1081, 1084 (6th Cir.1969); *see United States v. 760.807 Acres of Land*, 731 F.2d 1443, 1446 (9th Cir.1984). A court also must consider "the highest and most profitable use for which the property is adaptable and needed, or is likely to be needed in the near future." *United States v. 1,291.83 Acres of Land*, 411 F.2d at 1084; *see also United States ex rel. TVA v. Pow-*

*elson*, 319 U.S. 266, 275, 63 S.Ct. 1047, 1053, 87 L.Ed. 1390 (1943) (the land's fair market value "may reflect not only the use to which the property is presently devoted but also that use to which it may be readily converted"). The Court must consider the highest and best use of the property, either in its current state or for what it is likely to be needed in the reasonably near future, not necessarily "as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held." *Olson*, 292 U.S. at 255, 54 S.Ct. at 709.

■■■ This case differs somewhat from the usual land condemnation proceeding in that, with the exception of 1.87 acres, the United States is taking only a part of the landowner's bundle of rights in the subject property. The Sixth Circuit has indicated that in this kind of case, a court should employ a three step method of analysis. First, it should determine the before taking value of the property. Second, it should determine the after taking value of the property lying within the easement. Finally, it should determine the incidental damages, arising from the easement, to any land adjacent to the easement. *United States ex rel. TVA v. An Easement and Right of Way 200 Feet Wide and 3,435 Feet Long Over a Tract of Land in Madison County, Tennessee*, 405 F.2d 305, 307 (6th Cir.1968); *see also United States v. 760.807 Acres of Land*, 731 F.2d at 1447–48 ("[w]hen a portion of a tract of land is taken ... the owner is entitled to compensation for the diminution of the value of the remainder resulting from the taking"; such losses are compensable if "the landowner incurs a direct loss reflected in the marketplace that results from the taking"). The focus of the Court's concern, however, still is to place the landowner "in as good a position pecuniarily as if his property had not been taken." *Olson*, 292 U.S. at 255, 54 S.Ct. at 708. The landowner bears the burden of proving the value of the taking. *United States v. 1,291.83 Acres of Land*, 411 F.2d at 1084.

*Before Taking Value of the Property*

█ In accordance with the Sixth Circuit's decision in *An Easement and Right of Way,* the Court will first determine the before taking value of the subject property, on a per acre basis. Both parties' experts examined sales of comparable parcels of property to determine the subject property's before taking value. In addition, defendant's expert, Michael Salisbury, used an income approach to valuation to supplement his comparable sales findings. Both experts agreed that the highest and best use of the land before the taking was as cropland, although defendant's expert further qualified this use by indicating that it was as cropland irrigated by a center pivot irrigation system. Both experienced some difficulty in locating comparable sales, though, and had to make significant adjustments to the sales they did locate to make them truly comparable. They happened, moreover, to have chosen only one common parcel of property for examination.

Plaintiff's expert, Lynn Rush, analyzed twelve parcels of property in deriving his before taking value of $2,100 per acre. The parcels ranged in size from 40 acres to 775 acres, and in sales price from $752 per acre to $2,000 per acre. Mr. Rush made the following adjustments to these parcels to derive a comparable price. First, he adjusted for the time of the sale, which generally resulted in an addition to the sales price. Second, Mr. Rush adjusted for improvements to the subject property by adding to the sales price of the comparable sales parcels to account for the absence of buildings and other improvements. Third, he adjusted the prices to account for the presence or absence of irrigation systems or possibilities; the subject property has both center pivot and traveling gun irrigation systems on it. Fourth, Mr. Rush adjusted the prices to account for the sales parcels smaller sizes. He testified that he believes a smaller parcel of land costs more per acre than a larger parcel. Fifth, Mr. Rush adjusted the sales prices to account for the topography and soil of the comparable sales parcels. Since the subject property is level and has good corn-growing soil, he added to the prices of those parcels that were not as level or did not have as good soil. He also testified that for some parcels, he put adjustments for nontillable acreage and irregular shapes in this category. Finally, Mr. Rush adjusted for the conditions of the sale, taking into consideration whether the sales was an arms length transaction. After making these adjustments, he arrived at comparablesales prices ranging from $2,000 per acre to $2,200 per acre.

Defendant's expert, Mr. Salisbury, examined six comparable sales properties. He stated in his report, and testified at the trial, that he had difficulty locating suitable comparable sales. Consequently he, like Mr. Rush, had to adjust the sales prices of the comparable parcels substantially to derive a comparable price. Also like Mr. Rush, Mr. Salisbury made adjustments for the size of the parcels, their shape and topography, their soil type, and their capacity to be irrigated. He arrived, however, at comparable sales prices ranging from $2,300 per acre to $2,600 per acre. Unlike Mr. Rush, moreover, Mr. Salisbury used only 360 acres of the subject property as his standard for comparison. He testified that he used this smaller parcel because it could be irrigated as one unit, and because the taking did not affect the remainder of the property and hence did not change its value. As the Court will discuss in more detail later in this opinion, it agrees in general with Mr. Salisbury's definition of the affected acreage, and rejects both the United States' contention that it must consider the entire 666.7 acres of defendant's property and its contention that the taking affected only 120 acres of land. I reject the first contention because there is no evidence in the record that the taking affected all of defendant's property. The Sixth Circuit's opinion in *An Easement and Right of Way* indicates that in determining an after taking value, I should consider only the area under the easement and the incidental damage to land adjacent to the easement area. I reject the second contention because defendant has established that the taking affected land adjacent to the easement area.

Mr. Salisbury also conducted an income valuation of the subject property to supplement his market, or comparable sales, analysis. He testified that he did so because of the difficulty he had in finding comparable sales. In his income approach, Mr. Salisbury determined three values for the subject property: (1) its value for growing dryland corn; (2) the additional value contributed by a traveling gun irrigation system; and (3) the additional value contributed by a center pivot irrigation system. The property's before taking value equaled the sum of the dryland corn value and the value contributed by a center pivot irrigation system. From this approach, Mr. Salisbury derived a per acre value of $2,600 before the taking. He determined that land suitable for growing dryland corn has a value of $975 per acre, and that being able to use a center pivot method of irrigation adds $1,625 per acre to the land's value. Based on the lack of comparable sales, Mr. Salisbury determined that his income approach valuation of $2,600 per acre was more accurate than his comparable sales approach valuation of $2,400 per acre.

The Court believes that a before taking value of $2,400 per acre is fair and reasonable to the landowner and the United States. I am not completely comfortable with either expert's analysis. I believe Mr. Rush examined better comparable sales. He did not, however, adequately account for the irregular shapes of some of the comparable sales, or for their poor topography and the presence of nontillable acreage. On comparable LV–3, for example, Mr. Rush made only a $150 per acre adjustment to account for the presence of 39 nontillable acres, comparatively poor soil, and a hilly topography. Similarly, on LV–5 Mr. Rush made a $408 per acre adjustment to account for the presence of 20 nontillable acres (out of 40 total acres) and a somewhat undesirable location. Finally, on comparable LV–1, which is the parcel that Mr. Salisbury also examined, Mr. Rush underestimated the number of acres that had to be cleared of grapes and the cost of clearing them.

Mr. Salisbury, on the other hand, admits that he examined no truly comparable properties and that he had to make significant adjustments to determine a comparable price. For the four parcels that he believed were most comparable to the subject property, moreover, Mr. Salisbury arrived at estimates of $2,300, $2,300, $2,600, and $2,500 per acre. In addition, the Court, as it will discuss more extensively later in this opinion, does not completely agree with Mr. Salisbury's income analysis, although I do find it was a substantially accurate analysis of the subject property's market value. Finally, the Supreme Court has indicated a preference for the comparable sales approach as evidence of a property's fair market value. *See 50 Acres of Land*, 469 U.S. at 30, 105 S.Ct. at 455.

In accordance with the above discussion, the Court has settled on a before taking value of $2,400 per acre. In making this determination, the Court relied in particular on the sale of the parcel of property designated as plaintiff's comparable sale number LV–1 and defendant's comparable sale number 3. The sale price for this 145 acre parcel was $1,700 per acre. One must adjust this price upward because of the presence of grapes that had to be removed, the need to drill an irrigation well, and the lack of improvements. Given those factors, the Court believes the evidence justifies a comparable sale price for this parcel of $2,400 per acre. I cannot fully accept defendant's evidence that it cost the buyer $111,000 to remove the grapes and to drill the irrigation well because it introduced no evidence of the reasonableness of this cost or how it affected the purchase price. Finally, while defendant asserts that Mr. Rush failed to account properly for the comparable parcels' smaller sizes, *i.e.*, he assumed that the smaller parcels cost more per acre because of their size and hence subtracted from the comparable sales figure to account for that difference, Mr. Salisbury also considered the comparable parcels' smaller sizes to be a negative factor, *i.e.*, a factor requiring a minus adjustment, although he did consider the smaller size to require a positive adjust-

ment in terms of irrigation costs. Def.Exh. 3 at 8 (comparable # 4).

### After Taking Value of Property Within the Easement

■ The Court next must determine the after taking value of the property lying within the easement area. The parties agree that the easement affects at least 120 acres of defendant's property, consisting of the 104 acres lying under the easement plus the corner areas formed when the easement area is squared off. As Mr. Rush testified, it is logical to consider this 120 acre parcel, rather than simply the area under the radius formed by the easement, as the affected area because farmland is planted and irrigated in square and rectangular shaped parcels. I therefore will discuss this 120 acre parcel's after taking value in this section, and will discuss in the next section, which covers incidental damages, the additional 75 acres that defendant claims also is affected by the easement.

Mr. Rush determined, allegedly by using a comparable sales analysis, that the after taking value of defendant's property was $2,000 per acre. He arrived at this figure by determining the net present value of defendant's loss due to the taking, which he calculated to be $65,842.69, and dividing that figure by defendant's total acreage of 666.7 acres. The basis for Mr. Rush's determination that defendant's net loss due to the taking is $65,842.69 is set out in plaintiff's exhibit 2, which is an addendum to Mr. Rush's report. As defendant discusses in its post-trial summary of the evidence, the Court can place little, if any, confidence in Mr. Rush's conclusions for a number of reasons.

First, and most significantly, Mr. Rush used a factor of five years at 10%, or 3.79, to discount his calculations of defendants' losses to present value. Both Mr. Salisbury and plaintiff's other expert witness, Dr. Ross, testified that Mr. Rush erred in using a five year loss period. Mr. Salisbury's testimony that the proper time period is thirty (30) years appears reasonable, is not contradicted by any informed source, and is accepted by the Court. Mr. Rush,

moreover, used an interest rate of 10% in determining his discount factor. The Court agrees with Mr. Salisbury, however, that a lower discount rate, which more accurately reflects the rate of return in agriculture, is more appropriate. I reject both Mr. Rush's rate of 10% and Dr. Ross' rate of 8.0%. Neither witness is an expert in agricultural economics. I note in particular that Dr. Ross based his rate on the manufacturing sector of the economy; it was not specific to agriculture. Second, Mr. Rush erred in evaluating the economic lives of the different irrigation systems. In essence, he did not consider the difference between a center pivot system's life of 15 years and a traveling gun system's life of six to ten years. Finally, Mr. Rush erred in evaluating the production costs of corn.

Having rejected Mr. Rush's analysis, the Court must determine the effect on the subject property's fair market value of defendant's inability to use a center pivot irrigation system. The parties stipulated in their pretrial order that "[t]he subject property will, using center pivot irrigation, produce 40 more bushels of corn per acre than it will produce using the traveling gun system." Pretrial Order ¶ 7.6. Since the Court already has determined the subject property's value with a center pivot irrigation system, the issue is what is the property's value with a traveling gun irrigation system, which produces 40 bushels of corn per acre less than the center pivot system.

The parties agree that dryland corn property is worth between $800 and $1,000 per acre. As it will discuss shortly, the Court believes that a value of $900 per acre is fair and reasonable. I also believe that absent any evidence of comparable sales of properties irrigated with a traveling gun irrigation system, I should follow Mr. Salisbury's method of determining the marginal value of such a system. As the Court discussed previously, it cannot rely on Mr. Rush's analysis. Done correctly, moreover, his analysis, as defendant demonstrates in its post-trial summary, actually supports defendant's claim. Finally, Mr. Rush did not conduct a true after taking comparable sales evaluation of defendant's property. He simply used six of his before

taking comparable sales and subtracted $100 per acre to account for the alleged diminution in value of defendant's property due to the taking.

In determining the marginal value of using a traveling gun irrigation system, however, the Court cannot accept all of Mr. Salisbury's reasoning. I believe that some of Dr. Ross' criticisms of Mr. Salisbury's factors—specifically, his marginal net cash income/acre figures, his tax rate, and his economic life for a traveling gun irrigation system figure—are valid. The Court acknowledges that plaintiff apparently did not give defendant advance notice of Dr. Ross' testimony. In fact, Dr. Ross testified that he had finished his report only the night before his testimony. I believe, however, that defendant was able to cross-examine Dr. Ross adequately and that it was not significantly prejudiced by his testimony, some of which was important to the case. The Court therefore will overrule defendant's objection to Dr. Ross' report, plaintiff's exhibit 10, and will accept Dr. Ross' report and his testimony.

Dr. Ross had several criticisms of Mr. Salisbury's analysis. He argued that Mr. Salisbury had used an improper tax rate; that he had used an improper cost of funds figure, which led him to use an improper discount rate; that he had used an improper actual yield per acre for center pivot irrigation and an improper market or loan price for corn, and had failed to account for the setaside requirements of the government price subsidy program, in determining his marginal net cash income/acre for the irrigation systems; and that he had used an improper depreciation period for the traveling gun irrigation system. The Court agrees with some of Dr. Ross' criticisms, and has adjusted Mr. Salisbury's calculations accordingly. First, I believe that Dr. Ross' tax rates of 15% for the traveling gun system and 18% for the center pivot system are more accurate than Mr. Salisbury's flat rate of 20%. Second, I believe that Mr. Salisbury should have accounted for the setaside requirement of the government price subsidy program. Defendant does not deny that there is a setaside requirement, but attempts to argue that Mr. Salisbury implicitly accounted for it in his analysis and that the effect would be minimal. The Court agrees that Mr. Salisbury, intentionally or not, accounted in part for the setaside requirement by using 195 acres as his basis for analysis, rather than the total 202.5 tillable acres located in the area arguably affected by the easement. I thus have used a factor of 10% rather than 20% (Dr. Ross' factor) in considering the effect of that requirement. Third, the Court finds that Mr. Salisbury should have used an eight year depreciation period for the traveling gun irrigation system. As Dr. Ross testified, six years appears to be on the low end of the systems' economic life scale.

Using these revised figures, the Court calculated the marginal value of using a traveling gun irrigation system. I used a 5.5% discount or cost of funds rate (6.5% × .85); a yield per acre for center pivot irrigation of 185 bushels, which accords with the parties' pretrial stipulation; and a $2.56 market or loan price for corn, which is what the standard was at the time of the taking. I recalculated the figures using the approach found in appendix C of Mr. Salisbury's report; specifically, the Court attempted to redo the analysis at the bottom of the last page of this appendix using revised figures. Again, I observe that I employed this adjusted analysis because neither party provided expert testimony, based on a comparable sales analysis, of the fair market value of cornland irrigated with a traveling gun system. The Court's revised analysis, which is given in the chart attached to this opinion as appendix A, produced a net present marginal value of $147.97 per acre. The Court also used its corrected figures to revise Mr. Salisbury's estimate of the fair market value of dryland corn. This revision produced a value of $884.00 per acre, which compares favorably with Mr. Salisbury's comparable sales estimates of the value of such land. See Def.Exh. 3 at 8–9 (comparable sales nos. 5 & 6); *infra* app. A (analysis).

From these calculations, and the testimony and evidence produced at trial, the Court has determined that the fair market

value of cornland irrigated with a traveling gun irrigation system is $1,050 per acre. To reach this figure, the Court rounded the value of dry cornland up to $900 per acre, and rounded the marginal value of using a traveling gun irrigation system up to $150 per acre. Finally, as a check on the validity of this analysis, the Court calculated the value of cornland irrigated with a center pivot system using these same revised figures. The resulting value of $2,350 per acre supports the Court's determination that $2,400 per acre is a reasonable price for cornland irrigated with a center pivot system. The Court's calculation is given in appendix B.

Given a before taking value of $2,400 per acre, and an after taking value of $1,050 per acre, the loss to defendant due to the taking for the 118.13 acres of land lying under the easement (120 acres minus the 1.87 acres taken in fee simple) would appear to be $159,475.50. To arrive at a final damage figure, however, the Court also had to consider plaintiff's unrebutted testimony that defendant apparently is using a center pivot irrigation system that reaches at least some of the land under the easement. To account for this factor, admittedly in a rough manner, I adjusted the after taking per acre value up to $1,200, producing a loss to defendant of $141,756. I believe this adjustment is reasonable because it appears from defendant's exhibit 3, page 5, diagram B, that it economically could use a center pivot system to irrigate certain portions of the area under the easement. The final step in the Court's analysis is to determine whether the easement has caused any incidental damage to lands adjacent to it.

### Incidental Damages

█ Defendant argues vigorously that in addition to the 120 acres of land lying under the easement, the taking has affected seventy-five (75) acres of land adjacent to the easement area. This land consists of two parcels: (1) a thirty acre parcel lying northwest of the easement area; and (2) a thirty-five acre parcel lying south of the easement area, between the area and a public road. According to defendant's own expert testimony, the additional affected acreage is 65 acres, not 75 acres. Since the evidence supports only a claim that the taking affected an additional 65 acres of land, the Court will consider the incidental damage to that property.

Based on the evidence introduced at trial, the Court agrees with defendant that the taking affected the fair market value of these additional 65 acres. The United States protests that defendant has not demonstrated that it probably would have irrigated this land with a center pivot system, and that its claim of damage thus is remote and speculative. Mr. Salisbury's testimony, and even to a certain extent the testimony of Mr. Rush and Dr. Ross, indicated, however, that a rational farmer both would consider, absent the taking, using a center pivot irrigation system over the entire tract of land affected by the taking and, given the presence of the VORTAC facility, would not use a center pivot system in the northwest corner alone but rather would irrigate the entire affected tract of land with a traveling gun system. Mr. Salisbury's testimony, with the exceptions already discussed, was credible and reliable, particularly given his experience and training in the field of agricultural economics. Plaintiff also argues that defendant seeks to place itself "in a better position that [it was] before the Omni, even though [it] purchased the property while it was in place and carrying a restriction by way of a lease." Closing Argument at 6. The United States failed, however, to produce evidence regarding this lease at trial or to substantiate its argument that the presence of the lease should affect the Court's valuation of the taking's effect.

The Court thus concludes that defendant has adequately supported its claim that the taking affected an additional 65 acres of land by precluding it from irrigating such land with a center pivot system. As the Supreme Court indicated in *Olson*, the Court can consider this evidence to the extent that it reflects the fair market value of the land. As I already have discussed, a piece of property that can be irrigated with a center pivot system is more valuable,

because it can produce a higher output per acre with less investment and operating costs, than a piece of property that can be irrigated only with a traveling gun system. Defendants are entitled to be compensated, given the rather unusual circumstances of this case, for this depreciation in the fair market value of the 65 acres lying outside of the easement area. As I already have found, the before taking value of this acreage was $2,400 per acre. I find that the after taking value is $1,050 per acre. I do not adjust this figure upward because there is no evidence that a rational buyer would consider using a center pivot irrigation system on this land. Defendant's incidental damages due to the taking thus are $87,750.

In summary, I find that the value of the taking, and thus defendant's compensation, is composed of three elements. First, the 1.87 acres plaintiff took in fee simple is valued at $4,488. Second, the effect of the restrictive easement on the land lying under the easement is valued at $141,756. Third, the incidental damage to land lying adjacent to the easement area is valued at $87,750. The total value of the taking, measured as of the date of the taking, thus is $233,994. Since defendant already has received $70,000 as compensation for the taking, the Court will enter judgment against the United States in the amount of $163,994, plus interest. See 40 U.S.C. §§ 258a & 258e–1.

## APPENDIX A

### Revised Estimated Value of Dryland Corn Per Acre

$$\frac{\$57.20 \times (1 - \text{Tax Rate}) = 48.62}{6.5\% \times (1 - \text{Tax Rate}) = .055} = \$884.00$$

$57.20 is the revised net cash income/acre for dryland corn, taking into consideration a ten percent setaside. The Court used Dr. Ross' suggested tax rate for traveling gun irrigated corn of .15.

### Revised Marginal Value—Traveling Gun System

| | | | |
|---|---|---|---|
| Depreciation | $\times (1 - \text{Tax Rate}) = 16$ | $\times .15 =$ | 2.40 |
| Net Cash Income | $\times (1 - \text{Tax Rate}) = 32.81$ | $\times .85 =$ | $27.89 |
| | | Total | $30.29 |

NPV-Investment $128.00
$ 79.06
$ 51.51
$ 33.57
$292.14

NPV-Income = $30.29 × 14.53 (5.5% at 30 yrs.) = $440.11
NPV-Inves. =                                    $292.14
                                                $147.97

$147.97 marginal value added to $884 dryland corn value = $1,031.97, which is adjusted upward to $1,050.

Based on a depreciation period of 8 years; a tax rate of 15%; and a marginal net cash income/acre of $32.81.

## APPENDIX B

Revised Marginal Value-Center Pivot System

$$\text{Depreciation} \times (1 - \text{Tax Rate}) = 15.04 \times .18 = 2.71$$
$$\text{Net Cash Income} \times (1 - \text{Tax Rate}) = 143.06 \times .82 = \underline{117.31}$$
$$120.02$$

NPV-Investment    $225.64
       $ 95.80
       $321.44

NPV-Income = $120.02 × 14.81 (5.33% at 20 yrs.) = $1,777.50
NPV-Invest. =                               $321.44
                                         $1,456.00

$1,456.06 marginal value added to $884 dryland corn value = $2,340.06.

Based on a tax rate of 18% and a marginal net cash income/acre of $143.06.

---

## JUDGMENT

IT IS HEREBY ORDERED that JUDGMENT is entered FOR defendant and AGAINST plaintiff in the amount of $163,994.00, plus the following statutory interest: $17,350.57 for the period from September 16, 1983 to September 15, 1984; $21,725.08 for the period from September 16, 1984 to September 15, 1985; $16,062.81 for the period from September 16, 1985 to September 15, 1986; and $10,579.40 for the period from September 16, 1986 to the present date, July 24, 1987. The amount of the Judgment as of this date thus is $229,711.86. Interest shall continue to accrue at the rate of $33.80 per day (5.63% on a combined principal and accrued interest sum of $219,132.46 as of September 16, 1986) until the Judgment is paid.